IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 10 S. Howard Street, 3rd Floor Baltimore, MD 21201 | ) ) ) ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) ) | COMPLAINT |
| v. | ) ) | JURY TRIAL DEMAND |
| MVM, INC., 44620 Guilford Dr., Ashburn, VA 20147 | ) ) ) ) | |
| Defendant. | ) ) | |

## NATURE OF ACTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, *et. seq.* and Title I of the Civil Rights Act of 1991 ("Title VII"), to correct unlawful

employment practices on the bases of actual or perceived national origin (African) and

retaliation, and to provide appropriate relief to Charging Parties Mermoz Sikamba-Koyangbo,

Celedo Kemngang, Christensia Asong, Lasbery Nwabuwa, Frezghi Woldeab, Raymond Buhmbi,

Amadou Bah, Shelly Wallace, Oliver Asaah ("Charging Parties") and a class of aggrieved

employees who were adversely affected by such practices.  As alleged with greater particularity

below, the U.S. Equal Employment Opportunity Commission ("the Commission") alleges that

since at least October 28, 2013, Defendant has engaged in a pattern or practice of discrimination

based on actual or perceived national origin (African) by subjecting the Charging Parties and a

class of aggrieved employees to: (1) disparate terms and conditions of employment; (2) a hostile work environment; and (3) discharge or constructive discharge. The Commission further alleges that since at least October 28, 2013, Defendant has engaged in a pattern or practice of retaliating against the Charging Parties and a class of aggrieved employees who opposed its unlawful treatment of Africans or who otherwise engaged in protected activity, in violation of Title VII.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§§ 2000e-5(f)(1) and (3) ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed in numerous locations throughout Maryland, including within the jurisdiction of the United States District Court for the District of Maryland, Southern Division. Venue is proper in this Court.

## PARTIES

3. Plaintiff, the Commission, is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Section 706 (f)(1) and (3) of Title VII, 42 U.S.C. 2000e-5(f)(1) and (3).

4. Defendant MVM, Inc. (MVM) is a diversified securities firm that provides security services to public and private entities, including federal government agencies, on a contractual basis. It provides services internationally and domestically, including in Maryland, in Baltimore City, and Baltimore and Montgomery counties.

2

5.      At all relevant times, MVM has continuously done business in the State of Maryland, as well as other jurisdictions, and has continuously had at least fifteen employees.

6.      At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. Section 2000e-(b), (g), and (h).

## CONDITIONS PRECEDENT TO SUIT

7.      More than thirty days prior to the institution of this lawsuit, Mermoz Sikamba-Koyangbo, Celedo Kemngang, Christensia Asong, Lasbery Nwabuwa, Frezghi Woldeab, Raymond Buhmbi, Amadou Bah, Shelly Wallace, and Oliver Asaah filed charges with the Commission alleging violations of Title VII by Defendant.

8.      On November 3, 2016, the Commission issued to Defendant Letters of Determination finding reasonable cause to believe that it violated Title VII and inviting it to join with the Commission in informal methods of conciliation to endeavor to eliminate the discriminatory practices and provide appropriate relief.

9.      On April 17, 2017, the Commission conducted an in-person conciliation conference with Defendant.

10.     On April 20, 2017, the Commission issued a conciliation proposal which included an offer of monetary and non-monetary terms to endeavor to eliminate the discriminatory practices and provide appropriate relief.

11.     The Commission engaged in communications with Defendant to provide it the opportunity to remedy the discriminatory practices described in the Letters of Determination.

3

12.     The Commission was unable to secure from Defendant a conciliation agreement acceptable to the Commission.

13.     On May 23, 2017, the Commission issued to Defendant a Notice of Failure of Conciliation.

14.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## GENERAL ALLEGATIONS

15.     In or around September 2008, the National Institute of Health ("NIH") awarded MVM a five-year performance-based contract to provide security services at each of its four research campuses: NIH Main Campus (Bethesda, MD), Bayview Campus (Baltimore, MD), Poolesville (Poolesville, MD), and Fort Detrick (Frederick, MD).

16.     At all times relevant to this action, MVM employed the Charging Parties and a class of aggrieved individuals at one or more of the NIH campuses.

17.     Around October 2013, MVM appointed James Smith ("Smith") project manager ("PM") of its NIH contract.  As PM, Smith was responsible for the on-site supervision of over 400 MVM security personnel spread across the four campuses.  At the time of his appointment, approximately half of the employees were African.

18.     Around the same time, MVM hired Christopher McHale as its Vice President and General Counsel ("VPGC").  McHale was responsible for reviewing and approving employee discipline requests and handling complaints of discrimination.

19.     Within weeks of Smith's appointment, Smith began complaining that there were "too many Africans," mocking their accents, and declaring that he would reduce the number of

4

Africans on the NIH contract, including by refusing to hire them.

20.     Managers and supervisors reporting to Smith told employees who were African or perceived to be African to "go back to Africa," ridiculed their names, and called them pejorative names such as "African man," "African faggot," and/or "Africa."  They also instructed them not to speak in their native dialects.

21.     Following Smith's appointment, MVM denied the Charging Parties and a class of aggrieved individuals leave; forced them to work on their scheduled days off; forced them to work "hold-over" shifts (i.e., hours worked beyond their scheduled shifts); subjected them to heightened scrutiny; assigned them to undesirable posts; subjected them to fabricated incidents of misconduct; falsely accused them of poor performance; subjected them to discipline contrary to its progressive discipline policy; intimidated and threatened them with termination; denied them union representation, suspended them, and terminated them without cause.

22.     Additionally, MVM retaliated against the Charging Parties and a class of aggrieved individuals who opposed its unlawful treatment of Africans, and/or who complained to MVM, including VPGC McHale, about the discriminatory terms and conditions of employment and/or the hostile work environment to which Africans were subjected, and/or who otherwise engaged in protected activity by forcing them to work on their scheduled days off and/or work "hold-over" shifts; subjecting them to heightened scrutiny; reducing or changing their work hours; assigning them to undesirable posts; fabricating incidents of misconduct; falsely accusing them of poor performance; ignoring its progressive discipline policy; intimidating and threating them with termination; denying them union representation, and suspending and/or terminating

5

them.

23.    By late 2016, the number of Africans employed on MVM's NIH contract decreased.

### Mermoz Sikamba -Koyangbo

24.    Mermoz Sikamba-Koyangbo ("Sikamba"), a naturalized citizen of the United States, was born and raised in the Central African Republic, Africa and speaks with an African accent.  He began his employment with MVM in 2003 as a security guard and in November 2012, was promoted to Assistant Project Manager (APM) of Operations of the NIH contract – the position he held until his termination.

25.    As APM, Sikamba was responsible for NIH contract operations, including investigating employee misconduct, recommending discipline to Smith, and ensuring discipline was administered in accordance with MVM policies.

26.    In early 2014, Smith began undermining Sikamba's role as APM.  For instance, he instructed Sikamba's subordinates to bypass him and report directly to Smith.  He also excluded Sikamba from staff meetings.  Smith ignored Sikamba's recommendations to discipline non-African employees for rule violations, while subjecting Africans to harsh disciplinary action for minor infractions.

27.    Around April 11, 2014, Sikamba received an anonymous complaint from African employees detailing disparate treatment and a hostile environment created by Smith.  Sikamba shared the complaint with Director of Federal Security Gregory Wholean ("Wholean") around April 18, 2014, and  requested to be transferred to a  position away from Smith.

6

28.     Around April 24, 2014, Sikamba met with VPGC McHale to discuss his complaint.   Sikamba made clear that he wished to remain employed, but in a different position. MVM terminated him the same day, and later replaced him with a non-African employee.

**Shelly Wallace and Oliver Asaah**

29.     Shelly Wallace was born and raised in the United States. She joined MVM in March 1993 as a security guard.  In March 2013, MVM promoted her to Quality Control (QC) Manager on Main Campus – the position she held until her termination.   Wallace managed a team of three QC monitors: Oliver Asaah ("Assah"), Faustina Blay ("Blay"), and Charles Roper ("Roper").

30.     Asaah, a naturalized citizen of the United States, was born and raised in Cameroon, Africa and speaks with an African accent.  He began his employment with MVM in February 2003, and served as a QC monitor on Main Campus until the time of his termination.

31.      Blay was born and raised in Ghana, Africa and speaks with an African accent. She began her employment with MVM in August 2010, and served as a QC monitor on Main Campus until the time of her termination.

32.     In February 2014, Smith began subjecting Asaah and Blay to heightened scrutiny, including accusing them of failing to perform their duties.  Around the same time, he demanded that Wallace terminate their employment because "the damn Africans [thought] they [were] running things."

33.     In mid-March 2014, Asaah and Blay submitted written grievances to Wallace detailing the hostile environment created by Smith, including the derogatory comments he made

7

about Africans (i.e., that there were too many Africans and that it was his intention to reduce their numbers).  On April 10, 2014, Wallace met with Wholean and Smith to discuss their grievances.  On April 14, 2014, Asaah met with Wholean to discuss the same.

34.    On April 18, 2014, MVM terminated Wallace, Blay, and Asaah for alleged "poor performance" and replaced them with non-African employees.  MVM did not terminate Roper, the only non-African.

### Celedo Kemngang

35.    Celedo Kemngang ("Kemngang"), a naturalized citizen of the United States, was born and raised in Cameroon, Africa and speaks with an African accent.  He began his employment with MVM in December 2007 as a security guard, and at the time of termination was assigned to Main Campus.  In or around 2012, he was elected president of the local union, United Security & Police Officers of America (USPOA).

36.    On or around November 6, 2013, Kemngang telephoned Smith to introduce himself as union president. Upon hearing his accent, Smith passed the phone to APM Sikamba, who happened to be present, and demanded that Sikamba translate because he could "not understand [Kemngang's] accent."

37.    Around February 7, 2014, Kemngang's supervisor instructed him to keep his NIH identification active by logging into the NIH email system. Because he had not accessed the NIH email system since 2012, Kemngang requested his log-in credentials from NIH IT ("IT") who in turn provided him with the incorrect login credentials.  When Smith learned that Kemngang used the credentials to log-in, he accused Kemngang of fraudulently accessing the system, and suspended him without affording him union representation.  When Kemngang returned to his

post to collect his belongings, MVM terminated him for, *inter alia*, unauthorized access (i.e., using his identification to access his post after being suspended).

## Christensia Asong

38.     Christensia Asong ("Asong"), a green card holder, was born and raised in Cameroon, Africa and speaks with an African accent. She began her employment with MVM in March 2003 as a security guard, and at the time of termination was assigned to Main Campus. In 2012, she was elected vice-president of USPOA.

39.     When Asong initially met Smith around January 2014, he told her that "there were too many [Africans]" on the contract and that he "was not comfortable working with foreigners." Around the same time, she began receiving complaints from African employees regarding Smith's discriminatory behavior towards them.

40.     Around April 16, 2014, after a meeting with Smith to discuss the complaints, Asong collected contact information from employees who were interested in filing a grievance against Smith.   When Smith learned what Asong was doing, he suspended her for five days without pay.   When she returned to work, he transferred her to an undesirable post, and reduced her hours from full-to part-time.  In June 2015, Smith accused her of violating company policy by failing to check IDs at the checkpoint.   Asong complained to her supervisor, Lieutenant Dewdney Mazie ("Mazie"), an MVM employee since 1995, and together, they reviewed video surveillance of the alleged infraction.   The video showed that Asong checked the IDs of the employees in question.   Mazie subsequently defended Asong to Smith explaining that no violation had occurred.   Still, MVM terminated Asong's employment on June 26, 2015 and

Mazie's on July 13, 2015 in connection with the alleged breach.

### Fred Woldeab

41.     Fred Woldeab ("Woldeab"), a naturalized citizen of the United States, was born and raised in Eritrea, Africa and speaks with an African accent.   He began his employment with MVM in November 2001 as a security guard, and was subsequently promoted to Shift Manager on Main Campus – the position he held until his termination.

42.     Woldeab satisfactorily performed his job duties.   On April 9, 2014, Woldeab suffered a temporary injury and was on leave through June 22, 2014.   Although he was released to work on June 22, 2014, Smith rejected his paperwork and refused to allow him to return to work stating that the paperwork was "incomplete."   When Woldeab submitted an updated release on July 1, 2014, Smith terminated him for alleged poor performance.   MVM replaced Woldeab with a non-African employee.

### Lasberry Nwabuwa

43.     Lasberry Nwabuwa ("Nwabuwa"), a naturalized citizen of the United States, was born and raised in Nigeria, Africa and speaks with an African accent. He began his employment with MVM in May 2011 as a security guard, and served as a union steward.   At the time of termination, Nwabuwa was assigned to Main Campus.

44.     Around May 27, 2014, Nwabuwa sought leave to travel to Nigeria.   Shortly after, MVM approved his request, and Nwabuwa purchased his airfare.   Around late September 2014, Smith revoked Nwabuwa's approved leave requests.

45.     On October 7, 2014, Nwabuwa was running late to his scheduled shift.  Once he arrived on campus, he showed a non-African security guard his identification and was granted entry.  He then parked his vehicle in an unmarked space, changed his uniform inside NIH's restroom, and returned to move his vehicle to a nearby street.  Thereafter, he relieved the officer on duty and signed into his post ten minutes late.  On October 8, 2014, Smith accused Nwabuwa of breaching security by failing to show his identification to the guard on duty, entering campus through an unauthorized entrance, and leaving his post unguarded while he moved his car, all while remaining signed-in to his post.  Smith deactivated his credentials and suspended Nwabuwa indefinitely without pay.  After Nwabuwa appealed his suspension, Smith promised to reinstate him.  Instead, on December 15, 2014, MVM terminated his employment.

### Raymond Buhmbi

46.     Raymond Buhmbi ("Bhmbi"), a naturalized citizen of the United States, was born and raised in Cameroon, Africa and speaks with an African accent.  He began his employment with MVM in August 2009 as a security guard.  At the time of termination, Buhmbi was assigned to Main Campus.

47.     Around June 2014, Buhmbi submitted a leave request to visit his brother in Canada, which was rejected by Smith without explanation.  Buhmbi complained to VPGC McHale to no avail.

48.     Around September 30, 2014, MVM accused Buhmbi of a security breach during a post inspection.  Smith suspended him for five days without pay and without affording him union representation.  On March 19, 2015, Buhmbi was accused of a similar security breach.  Smith

again suspended Buhmbi without pay.  On March 30, 2015, MVM terminated his employment.

Buhmbi appealed his termination to VPGC McHale.  Although MVM agreed to reinstate

Buhmbi, it failed to do so and instead upheld his termination.

### Amadou Bah

49.     Amadou Bah ("Bah"), a naturalized citizen of the United States, was born and

raised in the Republic of Guinea, Africa and speaks with an African accent.  Bah began

employment with MVM in February 2006 as a security guard, and at the time of termination was

assigned to Bayview Campus.

50.     On January 31, 2015, a non-African security officer called him a "fucking African

faggot."  Bah complained to his supervisor, who escalated the incident to management.  Around

February 6, 2015, Smith interviewed Bah and the offending officer, who admitted to making the

epithet.  Smith then accused Bah of failing to report the incident to his supervisor, and suspended

him for three days without pay.  Bah filed an EEOC charge, alleging discrimination on the basis

of national origin and retaliation, in connection with his suspension, in March 2015. The

following month, Bah submitted three separate leave requests, all denied without explanation.  In

June 2015, Bah twice complained to VPCG McHale about Smith's discriminatory and retaliatory

behavior to no avail.  Around the same time, Bah learned that he was required to complete

training in order to remain on the contract.  Because the dates of training conflicted with his part-

time schedule, Bah's supervisor arranged for him to attend a separate training.  When Bah

contacted Smith to relay the arrangement made by his supervisor, Smith discouraged him from

attending the training and assured him that separate arrangements would be made for Bah.

Instead, on August 5, 2015, MVM terminated him for "failing to attend basic guard training."

## STATEMENT OF CLAIMS

## COUNT I
## PATTERN OR PRACTICE OF DISCRIMINATORY TREATMENT BASED ON NATIONAL ORIGIN
## (42 §§ 2000e-2(a))

51.     Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs, ¶¶ 7-50.

52.     Since at least October 28, 2013, MVM has engaged in a pattern or practice of unlawful discriminatory employment practices on its Maryland campuses, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by discriminating against the Charging Parties and a class of aggrieved individuals with respect to the terms and conditions of their employment because of their actual or perceived national origin (African); and subjecting the Charging Parties and a class of aggrieved individuals to a hostile work environment because of their actual or perceived national origin (African).

## COUNT II
## DISPARATE TERMS AND CONDITIONS OF EMPLOYMENT
## (42 U.S.C. §§ 2000e-2(a))

53.     Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs, ¶¶ 7-52.

54.     Since at least October 28, 2013, Defendant has engaged in unlawful employment practices at its Maryland campuses, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)

by subjecting the Charging Parties and a class of aggrieved individuals to discriminatory terms and conditions of employment because of their actual or perceived national origin (African).

## COUNT III
## HOSTILE WORK ENVIRONMENT
## (42 U.S.C. §§ 2000e-2(a))

55.   Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs, ¶¶ 7-54.

56.   Since at least October 28, 2013, Defendant has engaged in unlawful employment practices at its Maryland campuses, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting the Charging Parties and a class of aggrieved individuals to harassment and/or a hostile work environment because of their actual or perceived national origin (African) and/or failing to prevent and promptly correct the harassment and/or hostile work environment. The hostile work environment became so intolerable that some of the class of aggrieved individuals were forced to resign and were thereby constructively discharged.

## COUNT IV
## RETALIATION
## (42 U.S.C. § 2000e-3)

57.   Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs, ¶¶ 7-56.

58.   Since at least October 28, 2013, Defendant has engaged in unlawful employment practices at its Maryland campuses, in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e-3 by subjecting the Charging Parties and a class of aggrieved individuals to retaliation for engaging in

protected activity including, but not limited to, opposing and/or complaining about the discriminatory terms and conditions of employment and/or the hostile work environment to which Africans were subjected, including by forcing them to work on their scheduled days off and/or work "hold-over" shifts; subjecting them to heightened scrutiny; reducing or changing their work hours; assigning them to undesirable posts; fabricating incidents of misconduct; falsely accusing them of poor performance; subjected them to discipline contrary to its progressive discipline policy; intimidating and threating them with termination; denying them union representation; and suspending and/or terminating and/or constructively discharging them.

## COUNT V
## DISCHARGE AND CONSTRUCTIVE DISCHARGE
## (42 U.S.C. §§ 2000e-2(a))

59.     Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs, ¶¶ 7-58.

60.     Since at least October 28, 2013, Defendant has engaged in unlawful employment practices at its Maryland campuses, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by discharging or constructively discharging the Charging Parties and a class of aggrieved individuals because of their actual or perceived national origin (African) and/or in retaliation for engaging in protected activity.

61.     The effect of the practices complained of ¶¶ 15-60 has been to deprive the Charging Parties and a class of aggrieved individuals of equal employment opportunities and otherwise adversely affect their employment status because of their national origin or because they engaged in protected activity.

62.     The unlawful employment practices complained of in ¶¶ 15-60 were and are intentional.

63.     The unlawful employment practices complained of in ¶¶ 15-60 were done with malice or with reckless indifference to the federally protected rights of the Charging Parties and a class of aggrieved individuals.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.      Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with them, from engaging in discrimination based on national origin: (1) in the terms and conditions of employment; (2) in creating and maintaining a hostile work environment; (3) actually and constructively discharging employees, in violation of Title VII.

B.      Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with them, from retaliating against employees who engage in protected activity.

C.      Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for actual or perceived African employees and applicants, and which eradicate the effects of their past and present unlawful employment practices;

D.      Order Defendant to make whole the Charging Parties and a class of aggrieved individuals by providing appropriate back pay with prejudgment interest and front pay in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of

their unlawful employment practices, including, but not limited to, reinstatement;

E.      Order Defendant to make whole the Charging Parties and a class of aggrieved individuals by providing compensation for pecuniary and nonpecuniary losses, including emotional pain, suffering, anxiety, depression, embarrassment, degradation, and humiliation;

F.      Order Defendant to pay the Charging Parties and a class of aggrieved individuals punitive damages for the malicious and reckless conduct described above, in amounts to be determined at trial;

G.      Grant such further relief as the Court deems necessary and proper in the public interest; and

H.      Award the Commission its costs in this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by the Complaint.


Respectfully submitted,


JAMES L. LEE
Acting General Counsel

GWENDOLYN YOUNG REAMS
Associate General Counsel

DEBRA M. LAWRENCE
Regional Attorney

MARIA SALACUSE
Supervisory Trial Attorney
Bar No. 15562

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
10 S. Howard Street, 3rd Floor
Baltimore, Maryland  21201