# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. TDC-17-2864 |
| MVM, INC., | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") has filed suit against Defendant MVM, Inc. ("MVM") alleging that MVM subjected a class of African employees to national origin discrimination, consisting of disparate treatment and a hostile work environment, and to unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a) (2012). Pending before the Court is MVM's Motion to Dismiss and the EEOC's Motion to Stay. Having reviewed the Amended Complaint and the briefs, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6 (2016). For the reasons set forth below, MVM's Motion to Dismiss is GRANTED IN PART and DENIED IN PART, and the EEOC's Motion to Stay is GRANTED.

## BACKGROUND

The EEOC is a federal agency tasked with administering, interpreting, and enforcing Title VII. MVM is a security services firm that employs security guards in the State of Maryland.

In September 2008, the National Institutes of Health ("NIH") awarded a contract to MVM to provide security services for its four research campuses in Maryland, including the Main Campus in Bethesda, Maryland. In October 2013, MVM appointed James Smith as the project manager for the NIH contract. In that capacity, Smith was responsible for supervising, including on matters of discipline, the security personnel at each of the four campuses. Around the same time, MVM hired Christopher McHale as its Vice President and General Counsel. In that capacity, McHale was responsible for reviewing and approving employee discipline requests and handling complaints of discrimination.

When Smith was hired, approximately half of the 400 security personnel spread across MVM's four campuses were "African or foreign-born blacks." Am. Compl. ¶ 17, ECF No. 10. Within weeks of becoming project manager, Smith began complaining that there were "too many Africans" on the NIH contract, that he was not comfortable working with foreigners, and that he "couldn't understand their accents." *Id.* ¶ 19. He also stated his intention to reduce the number of Africans, including by refusing to hire them. Following these statements, MVM managers and supervisors who reported to Smith began mistreating employees who were African or perceived to be African, telling them to "go back to Africa," ridiculing their names and accents, calling them pejorative names such as "African faggot," and instructing them not to speak in their native dialects. *Id.* ¶ 20.

During Smith's tenure, MVM also engaged in a variety of negative actions against African and foreign-born black security personnel, including denying them leave, forcing them to work on their scheduled days off, forcing them to work extra hours beyond their scheduled shifts, assigning them to undesirable posts, subjecting them to heightened scrutiny, disciplining them more harshly than called for by its discipline policy, intimidating and threatening them with

termination, and denying them union representation so as to facilitate the imposition of discipline, suspensions, and termination without cause. MVM also obstructed employees from complying with MVM policy. For instance, in November 2014, Smith prevented Ronald Desir, a foreign-born black employee who speaks with an accent, from renewing his security credentials in order to justify his termination. MVM also fabricated incidents of misconduct and made false accusations of poor performance, such as in December 2014, when Smith falsely accused Anthony Stephens, another foreign-born black employee who speaks with an accent, of failing to open a garage on time in order to justify his termination. After witnessing such treatment, a number of employees complained to MVM, including to McHale, about the discriminatory treatment of Africans and those perceived to be African. MVM responded to these employees' complaints by subjecting them to the same forms of mistreatment that they alleged to be discriminatory. The EEOC alleges that at least nine employees were terminated either for discriminatory or retaliatory reasons.

Once several African or foreign-born black employees were terminated, including union leaders and the most senior African on the NIH contract, other such employees concluded that they, too, would face termination. Because termination would negatively affect their ability to retain their security clearances and thus their future job prospects, several of these individuals decided to resign. By late 2016, as a result of terminations and resignations, the number of Africans employed on the NIH contract had decreased by approximately 29 percent.

The following nine terminated employees filed charges against MVM with the EEOC: Mermoz Sikamba-Koyangbo, Shelly Wallace, Oliver Asaah, Celedo Kemngang, Christensia Asong, Fred Woldeab, Lasberry Nwabuwa, Raymond Buhmbi, and Amadou Bah ("the Charging Parties").

Mermoz Sikamba-Koyangbo ("Sikamba") is a naturalized United States citizen who was born and raised in the Central African Republic and speaks with an African accent. He was hired by MVM in 2003 and was promoted to Assistant Project Manager of Operations in November 2012. In that capacity, he assisted Smith with investigating employee misconduct and advised Smith regarding disciplinary outcomes. In early 2014, Smith began undermining Sikamba's role by instructing others to bypass Sikamba and report directly to him, excluding Sikamba from staff meetings, and ignoring Sikamba's recommendations to discipline non-African employees when they violated MVM rules. On April 11, 2014, Sikamba received an anonymous complaint from African employees regarding Smith's conduct, which he shared with MVM Director of Federal Security Gregory Wholean on April 18, 2014. On April 24, 2014, Sikamba met with McHale to request a transfer to a different position within MVM in which he would not work with Smith. Instead of granting a transfer, MVM terminated Sikamba that day and later replaced him with a non-African employee.

Shelly Wallace joined MVM in 1993 and was promoted to Quality Control Manager of the Main Campus in March 2013. In that capacity, she supervised Oliver Asaah, a naturalized United States citizen who was born and raised in Cameroon and speaks with an African accent; Faustina Blay, who was born and raised in Ghana and speaks with an African accent; and Charles Roper, a non-African. In February 2014, Smith accused Asaah and Blay of failing to perform their duties and demanded that Wallace terminate their employment, telling her that "the damn Africans" think they are "running things." *Id.* ¶ 33. In March 2014, Asaah and Blay submitted written grievances to Wallace alleging a hostile work environment, which included Smith's derogatory statements that there were too many Africans and that he intended to reduce their numbers. On April 10, 2014, Wallace met with Wholean and Smith to discuss these

4

grievances, and on April 14, 2014, Asaah met with Wholean for the same purpose. On April 18, 2014, MVM terminated Wallace, Blay, and Asaah for "poor performance" and replaced them with non-African employees. *Id.* ¶ 35.

Celedo Kemngang is a naturalized United States citizen who was born and raised in Cameroon and speaks with an African accent. Kemngang was hired by MVM in 2007 and was elected president of the local union, the United Security & Police Officers of America ("USPOA"), in 2012. On November 6, 2013, Kemngang called Smith to introduce himself as union president. Smith immediately passed the phone to Sikamba, who happened to be present, and demanded that Sikamba translate because he could "not understand [Kemngang's] accent." *Id.* ¶ 37. On February 7, 2014, Kemngang was instructed to keep his NIH identification active by logging into the NIH email system, which he had not done since 2012. Kemngang requested his log-in credentials from the Information Technology Department, which provided him with incorrect credentials. When Smith learned that Kemngang had attempted to access the NIH email system with incorrect credentials, he accused him of fraudulently accessing the system. Kemngang was then suspended without being afforded union representation. When Kemngang was notified of his suspension, a manager other than Smith referred to him as "African man." *Id.* ¶ 38. Kemngang complained to McHale about his suspension and being called "African man." *Id.* He was then terminated.

Christensia Asong, a lawful permanent resident of the United States who was born and raised in Cameroon and speaks with an African accent, was hired by MVM in 2003 and was elected vice president of the USPOA in 2012. In January 2014, during Asong's first meeting with Smith, Smith stated "there were too many [Africans]" on the NIH contract and that he "was not comfortable working with foreigners." *Id.* ¶ 40. Around that time, Asong began receiving

5

complaints about Smith from African employees. On April 16, 2014, Asong met with Smith to discuss both her own complaints about his behavior and the complaints of other African employees. Asong then began to collect contact information from employees interested in filing a grievance against Smith. When Smith learned of this activity, he suspended Asong for five days without pay and then, when she returned, transferred her to an undesirable post and reduced her hours to part-time. In June 2015, Smith accused Asong of violating MVM policy by failing to check identification cards at a checkpoint. However, when Asong and her supervisor, Lieutenant Dewdney Mazie, reviewed video surveillance of the alleged infraction, they determined that Asong had, in fact, checked the identification cards. After Mazie tried to explain to Smith that there had been no violation, MVM terminated Asong on June 26, 2015 and Mazie on July 13, 2015.

Fred Woldeab is a naturalized United States citizen who was born and raised in Eritrea and speaks with an African accent. Woldeab was hired by MVM in 2001 and was later promoted to Shift Manager at the Main Campus. On April 9, 2014, Woldeab suffered a temporary injury that required him to take leave until June 22, 2014. When Woldeab attempted to return to work after his leave, Smith did not allow him to do so, stating that his paperwork was "incomplete." *Id.* ¶ 43. When Woldeab submitted updated paperwork on July 1, 2014, Smith did not accept it and instead terminated Woldeab and replaced him with a non-African employee.

Lasberry Nwabuwa is a naturalized United States citizen who was born and raised in Nigeria and speaks with an African accent. Nwabuwa was hired in 2011 as a security guard and has served as a union steward. In February 2014, Nwabuwa met with Smith to complain about the discriminatory treatment of Mambu Massaquoi, a foreign-born black employee who speaks with an accent and was terminated as a result of a fabricated incident of misconduct. On May

27, 2014, Nwabuwa sought leave to travel to Nigeria in late November and early December 2014. Although MVM approved his request and Nwabuwa purchased an airline ticket, Smith revoked this approval in September 2014. On October 8, 2014, Smith suspended Nwabuwa indefinitely without pay based on the accusations that he failed to show his identification to the guard on duty, entered the campus through an unauthorized entrance, and left his post unguarded while he moved his car. After Nwabuwa appealed this suspension, he was terminated on December 15, 2014.

Raymond Buhmbi is a naturalized United States citizen who was born and raised in Cameroon and speaks with an African accent. Buhmbi was hired by MVM in 2009. In June 2014, Buhmbi submitted a leave request to visit his brother in Canada, which Smith rejected without explanation. Buhmbi unsuccessfully complained about the denial to McHale. On September 30, 2014, Smith accused Buhmbi of a security breach, then suspended him for five days without pay and did not afford him union representation. In February 2015, Buhmbi overheard another supervisor state that "there [were] too many Africans" on the NIH contract. *Id.* ¶ 51. On March 19, 2015, Smith accused Buhmbi of another security breach and again suspended him without pay. After Buhmbi met with Smith and McHale to challenge his suspension, he was terminated on March 30, 2015.

Amadou Bah, a naturalized United States citizen, was born and raised in the Republic of Guinea and speaks with an African accent. Bah joined MVM in 2006 as a security guard. On January 31, 2015, another security guard called Bah a "fucking African faggot." *Id.* ¶ 54. After Bah complained to management, Smith interviewed both Bah and the officer, who admitted that he made the statement. Nevertheless, Smith suspended Bah for three days without pay for failing to report the incident to his supervisor. In March 2015, Bah filed an EEOC charge

7

alleging discrimination on the basis of national origin and retaliation in connection with the suspension. In April 2015, Bah submitted three separate leave requests, each of which was denied without explanation. In June 2015, Bah unsuccessfully complained to McHale about Smith's actions. Around that time, Bah was informed that he was required to complete a training session. Because the scheduled dates of the training conflicted with his part-time schedule, Bah arranged to attend a separate training on a different day. When Bah informed Smith of this arrangement, Smith discouraged him from attending and assured him that he would be able to complete the training through a different arrangement. Instead, on August 5, 2015, MVM terminated Bah for "failing to attend basic guard training." *Id.* ¶ 54.

After the EEOC received the Charging Parties' complaints and conducted an investigation, it issued Letters of Determination ("LODs") on November 3, 2016, finding that there was reasonable cause to believe MVM had violated Title VII and inviting MVM to engage in informal conciliation. In each letter, Rosemarie Rhodes, Director of the EEOC Baltimore Field Office, summarized the Charging Party's allegations and found reasonable cause to believe that MVM had discriminated against the Charging Party through "unequal, terms, conditions, and privileges of . . . employment because of . . . national origin," had retaliated against the Charging Party for engaging in protected activity, or both. *See, e.g.*, Buhmbi LOD at 1-2, Mot. Dismiss Ex. 1, ECF No. 11-2.

In each LOD, Rhodes concluded that:

I find that there is reasonable cause to believe that since at least October 2013, Respondent has subjected a class of foreign-born black applicants and employees, particularly Africans, and black applicants and employees who were perceived to be foreign-born, all of whom applied or were assigned to the NIH contract, to disparate terms, conditions, and privileges of employment, a hostile work environment, and disparate hiring and promotion practices. I further find that Respondent subjected to retaliation and retaliatory harassment employees who opposed its unlawful practices or otherwise engaged in protected activity by, *inter*

8

*alia*, subjecting them to heightened scrutiny, denied leave requests, and unwarranted disciplinary actions, including discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended. This pattern or practice of discrimination is ongoing.

*E.g., id.* at 2. In each LOD, Rhodes also stated:

Evidence obtained during the Commission's investigation revealed Project Manager James Smith openly displayed animus towards foreign-born black employees, particularly Africans, and black employees who were perceived to be foreign-born, by making derogatory remarks about their perceived national origin, subjecting them to disparate terms, conditions, and privileges of employment, thereby creating a hostile work environment. Furthermore, testimonial evidence revealed Project Manager Smith openly expressed his discomfort in working with African employees and his intent to reduce the number of employees with accents assigned to the National Institutes of Health (NIH) contract. Additionally, evidence obtained during the course of the investigation revealed that he and other members of management retaliated against, up to and including discharge, and subjected to retaliatory harassment, employees who opposed Respondent's discriminatory actions or otherwise refused to comply with Respondent's instructions to discipline without just cause, foreign-born black employees, particularly Africans, and black employees who were perceived to be foreign-born.

*E.g., id.* at 1–2.

On April 17, 2017, the EEOC and MVM engaged in an in-person conciliation conference, and the EEOC sent MVM a proposed conciliation agreement three days later. The parties were unable to agree upon the terms of a conciliation agreement. On May 23, 2017, the EEOC issued a Notice of Failure of Conciliation.

On September 27, 2017, the EEOC filed the present case on behalf of the Charging Parties and a class of aggrieved individuals. As amended, the Complaint alleges five counts of violations of Title VII, consisting of: (I) a pattern or practice of discriminatory treatment based on national origin; (II) disparate terms and conditions of employment based on national origin; (III) a hostile work environment based on national origin; (IV) discharge and constructive discharge based on national origin; and (V) unlawful retaliation.

9

**DISCUSSION**

In its Motion to Dismiss, MVM argues that portions of the Amended Complaint must be dismissed for various reasons. MVM's primary argument is that the Amended Complaint contains claims of disparate treatment on behalf of a class of aggrieved individuals, including claims of discriminatory termination and constructive discharge, which go beyond the scope of the underlying LODs. In its Motion to Stay, the EEOC requests that the Court stay the proceedings for 45 days to afford it an opportunity to amend its LODs to address this issue and engage in conciliation efforts based on the amended LODs before the case proceeds.

MVM makes four other arguments in its Motion to Dismiss, including that discrimination based on "perceived" national origin is not cognizable, that certain allegations in the Amended Complaint are based on incidents that do not rise to the level of "adverse employment actions," that the EEOC has failed to state a plausible claim for constructive discharge, and that the EEOC has failed to state a plausible claim of retaliation arising from the termination of Lasberry Nwabuwa. The Court will first address the Motion to Stay and thereby address the primary argument in the Motion to Dismiss. The Court will then address the remaining arguments in the Motion to Dismiss.

**I.      Motion to Stay**

Having considered MVM's argument that certain claims asserted in the Amended Complaint were not identified in the LODs, the EEOC moves to stay the proceedings for 45 days in order to amend the LODs and engage in additional conciliation based on the amended LODs. "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936).   A district court

10

determining whether to grant a motion to stay "must weigh competing interests and maintain an even balance." *Id.* at 254–55.

When considering a discretionary motion to stay, courts typically examine three factors: (1) the impact on the orderly course of justice, sometimes referred to as judicial economy, measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected from a stay; (2) the hardship to the moving party if the case is not stayed; and (3) the potential damage or prejudice to the non-moving party if a stay is granted. *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005); *see also, e.g., Mullins v. Suburban Hosp. Healthcare Sys., Inc.*, No. PX-16-1113, 2017 WL 3023282, at *1 (D. Md. July 17, 2017); *Davis v. Biomet Orthopedics, LLC*, No. 12-3738-JKB, 2013 WL 682906, at *1 (D. Md. Feb. 22, 2013).

The EEOC argues that a stay would advance judicial economy because amendment of the LODs would eliminate the need for the Court to parse the text of the original LODs to determine whether MVM was properly notified of all claims in the Amended Complaint. Noting that it could instead simply dismiss the case, amend the LODs, engage in renewed conciliation, and re-file the case if necessary, the EEOC argues that a stay to allow for amendment and additional conciliation is more efficient for the Court and the parties. At this stage, where MVM has yet to file an answer or a motion for summary judgment, and the EEOC has not previously dismissed a case based on the events at issue here, the EEOC could unilaterally dismiss the case without prejudice to re-filing. *See* Fed. R. Civ. P. 41(a)(1)(A)(i) (stating that "the plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment"); Fed. R. Civ. P. 41(a)(1)(B) (noting

11

that absent a prior dismissal of a case based on the same claim, a Rule 41(a)(1) dismissal is without prejudice).

Although the EEOC is correct that a stay would be a more efficient approach to allow for amendment of the LODs, MVM argues that a stay would serve no purpose because the EEOC is not permitted to amend its LODs. The EEOC, however, asserts that it may amend its LODs pursuant to its regulations, specifically, 29 C.F.R. § 1601.21(d). Although this regulation states that an LOD is "final when the letter of determination is issued," it further provides that:

> [T]he Director of the Office of Field Programs, or upon delegation, the Director of Field Management Programs; each District Director; each Field Director; each Area Director and each Local Director, for the determinations issued by his or her office, *may on his or her own initiative reconsider such determinations*, except that such directors may not reconsider determinations of reasonable cause previously issued against a government, governmental agency or political subdivision after a failure of conciliation as set forth in § 1601.25.

29 C.F.R. § 1601.21(d) (2017) (emphasis added). To effect such a reconsideration, the EEOC would issue a notice of intent to reconsider, which would vacate the LOD, then the relevant Director would reconsider the determinations of reasonable cause and "issue a determination anew." *Id.* § 1601.21(d)(1). Thus, the plain language of the regulation permits reconsideration of a reasonable cause determination and the issuance of a new LOD.

Although MVM argues that 29 C.F.R. § 1601.21(d) is limited to reconsideration of cases in which the EEOC has issued a right-to-sue letter to an individual, as opposed to cases in which the EEOC has itself filed suit, the regulation provides no such limitation. Indeed, the regulation addresses the reasonable cause determination, a step that occurs for all complaints filed with the EEOC and necessarily occurs before any decision by the EEOC whether it will file suit. *See* 29 C.F.R. §§ 1601.21, 1601.27, 1601.28 (discussing reasonable cause determinations separately from the specific authorizations for EEOC civil actions or the issuance of right-to-sue letters).

Moreover, the regulation explicitly contains an exception which bars reconsideration of reasonable cause determinations against a governmental agency after failed conciliation. *See* 29 C.F.R. § 1601.21(d). Where the regulation contains certain exceptions to the general rule permitting reconsideration of reasonable cause determinations, the absence of an explicit exception to bar reconsideration in cases filed by the EEOC provides a strong indicator that no such exception exists. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *Black & Decker Corp. v. CIR*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction."). The Court therefore concludes that the EEOC is permitted to amend its LODs and engage in additional conciliation efforts.

This conclusion is supported, to a limited degree, by *Mach Mining v. EEOC*, 135 S. Ct. 1645 (2015). Although MVM is correct that *Mach Mining* primarily addressed the issue of inadequate conciliation efforts and does not specifically authorize a stay to correct alleged deficiencies in an LOD, it did state that if an employer can show that "the EEOC did not provide *the requisite information about the charge* or attempt to engage in a discussion about conciliating the claim . . . the appropriate remedy is to order the EEOC to undertake the mandated efforts to obtain voluntary compliance," rather than to dismiss the case. *Id.* at 1656 (emphasis added) (citing 42 U.S.C. § 2000e-5(f)(1), which authorizes a stay of a Title VII action for that purpose). MVM's rigid position that the EEOC may have only one opportunity to provide notice of charges through its LOD is inconsistent with the *Mach Mining* Court's willingness to allow additional opportunities to provide notice of charges and engage in conciliation, precisely the steps that the EEOC seeks to accomplish through its proposed stay.

Here, the EEOC is seeking a stay to amend its LODs as permitted by its regulations and then engage in another attempt at voluntary conciliation. In the absence of a stay either the Court would have to engage in detailed, fact-based analysis of the adequacy of the LODs, or the EEOC would dismiss and re-file the case. Under these circumstances, the Court concludes that a stay is the most efficient path forward in this case.

As for the remaining factors, the Court does not find that denial of a stay would impose significant hardship on the EEOC. Although the EEOC would be forced to go through the roundabout dismissal and re-filing process described above, it could hardly complain about such an outcome, as the less-than-precise drafting of the LODs is a problem of the EEOC's own creation.

At the same time, however, the prejudice to MVM from a stay will be minimal. Where the Court has found that the EEOC may amend its LODs, granting a stay will simply streamline that process so as to not cause further delay. The case has not proceeded past the motion-to-dismiss stage, and no discovery has occurred. *Cf. EEOC v. CollegeAmerica Denver, Inc.*, No. 14-CV-01232-LTB-MJW, 2015 WL 6437863, *3 (D. Colo. Oct. 23, 2015) (denying a stay to allow further conciliation efforts in part because the EEOC had engaged in "protracted delay" and the parties had already proceeded into discovery). The 45-day period will have little impact on the timeline for this case. Moreover, the Court has chosen to rule on MVM's Motion to Dismiss in order to guide the course of the case, which means that MVM's work to date was not wasted.

Most importantly, while MVM may have identified a technical weakness with the LODs in that the EEOC did not specifically assert that it found reasonable cause to believe that MVM had engaged in discriminatory terminations or constructive discharges of African and foreign-

14

born black personnel, the Court has little concern that MVM was truly blindsided by such allegations in the Amended Complaint. The primary purpose of an LOD is to put a defendant on notice of what the EEOC believes it has done wrong, so that the defendant can conduct its own investigation and decide whether to engage in voluntary compliance. *See EEOC v. Chesapeake & Ohio Ry. Co.*, 577 F.2d 229, 232 (4th Cir. 1978) ("The reasonable cause determination is not designed to adjudicate an employer's alleged violations of the Act but to notify an employer of the commission's findings and to provide common ground for conciliation."); *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1236 (6th Cir. 1980) ("Two principal purposes of the determination letter are to notify the employer of the Commission's findings and to provide a common ground for conciliation.") (citing *Chesapeake & Ohio Ry. Co.*). Here, the LODs provided substantial information that put MVM on notice of the nature of the alleged discrimination to allow it to conduct an appropriate investigation. For example, the LODs stated that there was evidence that Smith "openly displayed animus towards foreign-born black employees, particularly Africans, and black employees who were perceived to be foreign-born," including when he "openly expressed his discomfort in working with African employees and his intent to reduce the number of employees with accents assigned to the" NIH contract. *See, e.g.*, Buhmbi LOD at 1-2. The LODs notified MVM that there was evidence that Smith subjected personnel to "disparate, terms, conditions, and privileges of employment" and thereby created a "hostile work environment," and that he and other members of MVM management retaliated against, up to and including discharge, and subjected to retaliatory harassment, employees who opposed Respondent's discriminatory actions." *Id.*

The EEOC specifically found reasonable cause to believe that African and foreign-born black employees were subjected to "disparate terms, conditions, and privileges of employment,"

*id.* at 2, which courts have interpreted to include termination decisions. *See EEOC v. Procter &*
*Gamble Mfg. Co.*, No. N-76-1818, 1979 WL 296, at *2 (D. Md. Jan. 3, 1979) (stating that "the
phrase 'terms and conditions of employment' may encompass both discipline and discharge
practices and policies"). It also specifically found reasonable cause to believe that MVM had
engaged in retaliatory discharge of such personnel, thus putting MVM on notice that its
investigation had to examine the terminations of the Charging Parties. So even if the LODs were
technically deficient and in need of amendment, MVM cannot reasonably argue that it lacked
sufficient notice of the charges so as to preclude a meaningful investigation and conciliation
process.

Likewise, the details provided in the LODs belie any claim that the EEOC engaged in a
strategy of "suing first, and asking questions later," Opp'n Mot. Stay at 5, ECF No. 23, such that
MVM is prejudiced by a shifting investigation. The investigation was thorough and is complete;
it is only the drafting that needs to be revised. MVM will receive a full opportunity to engage in
conciliation on any issues it did not understand to be at issue. Thus, the Court concludes under
these facts that MVM will not be significantly prejudiced by a short stay at this early stage of the
case.

After weighing the competing interests, the Court concludes that a stay is warranted by
judicial economy, and there is no unfair prejudice to MVM. The Court will therefore grant the
EEOC's Motion to Stay.

## II.     Motion to Dismiss

Having granted the Motion to Stay in order to permit an amendment to the LODs, the
Court concludes that MVM's request for dismissal of claims, such as discriminatory termination,
that were not specifically identified in the LODs is now moot. Such an argument may be

renewed, if appropriate, after the amendment of the LODs. In order to provide guidance to the parties as the case proceeds, the Court will address MVM's remaining arguments for dismissal of particular claims: (1) that discrimination on the basis of perceived national origin is not cognizable under Title VII; (2) that certain allegations underlying the disparate treatment claims in Counts I and II are not "adverse employment actions"; (3) that the EEOC has not stated a plausible claim of discriminatory constructive discharge in Count IV; and (4) that the EEOC has not stated a plausible claim of retaliation in Count V relating to the termination of Lasberry Nwabuwa.

### A.     Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### B.     Perceived National Origin

MVM seeks to dismiss those parts of the Amended Complaint alleging discrimination on the basis of "perceived" national origin, presumably those allegations made by foreign-born black employees who were perceived to be, but were not, of African origin. MVM argues that discrimination on the basis of perceived national origin is not a cognizable claim under Title VII.

Title VII prohibits discrimination based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although the United States Court of Appeals for the Fourth Circuit has not addressed in a published opinion whether discrimination on the basis of perceived national origin is actionable under Title VII, several other circuits have held that it is. In *EEOC v. WC&M Enterprises, Inc.*, 496 F.3d 393 (5th Cir. 2007), the plaintiff was subjected to a hostile work environment, including being called "Taliban" and "Arab" in a derogatory manner, even though he was, in fact, of Indian origin. *Id.* at 402. The court held that "a party is able to establish a discrimination claim based on its own national origin even though the discriminatory acts do not identify the victim's actual country of origin." *Id.* at 401. Likewise, in *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012), the court held that "a harasser's use of epithets associated with a different ethnic or racial minority will not necessarily shield an employer from liability." *Id.* at 1299 (citing *WC&M*) (considering derogatory references to the plaintiff as "Indian" even though the plaintiff was not Indian). *Cf. Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002) (stating that an "employer is still discriminating on the basis of religion even if the applicant he refuses to hire is not in fact a Muslim"); *Estate of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, (9th Cir. 2001) (finding that a white plaintiff had standing to assert a discrimination claim under the Equal Protection Clause when he was mistakenly believed to be Native American).

A judge in this District has also concluded that Title VII bars discrimination on the basis of perceived national origin. *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 844, 849 (D. Md. 2015) (holding that Title VII covers a claim that an individual of Iranian national origin and Persian ethnicity was subjected to discrimination because she was mistakenly thought to be from the Parsee ethnic group in India). Other district courts have reached the same

18

conclusion. *See LaRocca v. Precision Motorcars, Inc.*, 45 F. Supp. 2d 762, 769-70 (D. Neb. 1999); *see also Boutros v. Avis Rent A Car Sys., LLC*, No. 10 C 8196, 2013 WL 3834405, at *7 (N.D. Ill. July 24, 2013) (rejecting the argument that there was no discrimination because the plaintiff, who was subjected to anti-Arab statements, was actually of Assyrian ethnicity); *Zayadeen v. Abbott Molecular, Inc.*, No. 10 C 4621, 2013 WL 361726, at *8 (N.D. Ill. Jan. 30, 2013) (holding that a plaintiff subjected to derogatory comments that he looked and sounded like an character who is of Kazakhstan national origin could advance a national origin discrimination claim even though he was, in fact, of Jordanian national origin).

In reaching this conclusion, the *WC&M* and *Arsham* courts relied in part on EEOC regulations and guidance interpreting national origin discrimination to include discrimination on the basis of perceived national origin. *WC&M*, 496 F.3d at 401; *Arsham*, 85 F. Supp. 3d at 846. In 1980, the EEOC promulgated a regulation defining "national origin," which is still in effect today. *See* 29 C.F.R. § 1606.1. Under that regulation, "national origin discrimination" includes, but is not limited to, "the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the *physical, cultural, or linguistic characteristics of a national origin group.*" *Id.* (emphasis added). The EEOC also issued guidelines stating:

> In order to have a claim of national origin discrimination under Title VII, it is not necessary to show that the alleged discriminator knew the *particular* national origin group to which the complainant belonged . . . . [I]t is enough to show that the complainant was treated differently because of his or her foreign accent, appearance, or physical characteristics.

Guidelines on Discrimination Because of National Origin, 45 Fed. Reg. 85633 (Dec. 29, 1980). More recently, the EEOC issued guidance stating that "Title VII prohibits employer actions that have the purpose or effect of discriminating against persons because of their real or perceived

national origin." U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on National Origin Discrimination* (Nov. 18, 2016), https://www.eeoc.gov/laws/guidance/upload/national-origin-guidance.pdf. Thus, the EEOC interprets Title VII to prohibit discrimination based on perceived national origin.

Courts may appropriately consider and defer to EEOC regulations and guidelines in interpreting Title VII. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that rulings, interpretations, and opinions of an agency are "not controlling upon the courts by reason of their authority," but "they do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141-42 (1976), *overruled by statute on other grounds* (applying *Skidmore* to EEOC rules and regulations). The weight given to an agency's guidance is based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Here, the Court finds the EEOC's interpretation persuasive in part because "the EEOC's Guidelines were adopted after promulgation of proposed, revised guidelines and receipt and incorporation of public comments. Such a process is evidence of the thoroughness of the EEOC's consideration, and the Commission has not wavered since in its position." *Arsham*, 85 F. Supp. 3d at 847.

The EEOC's interpretation is also consistent with the language of the statute, which bars discrimination based on an individual's "national origin." 42 U.S.C. § 2000e-2. When an employee is subjected to discrimination on the basis of "the physical, cultural, or linguistic characteristics of a national origin group," such as a foreign accent, it is entirely reasonable to conclude that the perpetrator of the discrimination is motivated by the employee's own national

origin, even if that national origin is different from the one perceived by the perpetrator. For example, if an employer harbors discriminatory animus against individuals from Pakistan, if he acts on that animus to mistreat an individual of Indian national origin who has an accent and appearance that he perceives to be those of a Pakistani, but in fact are associated with India, it is reasonable to conclude that he has discriminated on the basis of the victim's Indian origin, because the discrimination is, in fact, triggered by the victim's Indian accent and physical features. *See LaRocca v. Precision Motorcars, Inc.*, 45 F. Supp. 2d 762, 769-70 (D. Neb. 1999) (finding that an Italian American plaintiff who was subjected to anti-Mexican remarks by a manager who had "ignorantly used the wrong derogatory ethnic remark" had endured discrimination based on his Italian national origin because his "Italian characteristics," including dark brown skin, were the "foundation" of the discrimination, such that "he would not have been subject to the alleged harassment if he had not been of Italian descent").

To conclude otherwise would be to allow discrimination to go unchecked where the perpetrator is too ignorant to understand the difference between individuals from different countries or regions, and to provide causes of action against only those knowledgeable enough to target only those from the specific country against which they harbor discriminatory animus. *See Arsham*, 85 F. Supp. 3d at 845 (noting that it is "fundamentally abhorrent" to shield an employer from liability based on a mistaken perception of the victim's actual national origin because the discrimination is "no less injurious to the employee"). Such a perverse result runs contrary to Congress's intent in Title VII. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971) ("The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.").

Discrimination where the employer is mistaken in his belief that an employee is of a particular national origin is just as insidious as discrimination where the employer is correct, because the culpability of the employer and the hardship suffered by the employee are the same, and the employee is adversely impacted by a characteristic that Congress has decided should be irrelevant in the employment context.

In the face of precedent from several circuits and EEOC guidance deserving of deference, MVM argues that Title VII nevertheless does not protect against discrimination based on perceived national origin because the statute does not include the word "perceived." Mot. Dismiss at 18-20, ECF No. 11-1. It therefore concludes that the EEOC's guidance is not a reasonable interpretation of the statute. MVM relies primarily on *El v. Max Daetwyler Corp.*, No. 3:09-CV-415, 2011 WL 1769805 (W.D.N.C. May 9, 2011), *aff'd*, 451 F. App'x 257 (4th Cir. 2011), an unpublished district court opinion in which the court found that Title VII does not protect against discrimination based on the perception that someone belongs to a particular religion. *Id.* at *1. In so ruling, the court analogized to the Americans with Disabilities Act, which explicitly provides protection for individuals who are perceived to have a disability within the meaning that statute, but in fact do not. *Id.* at *5; 42 U.S.C. § 12102(1)(C) (defining "disability" as including "being regarded as having such an impairment"). The court reasoned that "if Congress had wanted to permit a similar cause of action under Title VII for 'perceived religion' discrimination, it could have so provided." *El*, 2011 WL 1769805, at *5. However, as was noted in *Arsham*, Title VII was enacted long before the ADA, such that by the time the ADA was enacted in 1990, Congress "may not have thought it necessary to revise Title VII to conform with the wording of the ADA if it was aware of the EEOC's published 'Guidance on Discrimination Because of National Origin,'" which had already been issued. *Arsham*, 85 F.

22

Supp. 3d at 846. In fact, the Court finds it most plausible that because Congress was legislating against the backdrop of Title VII and the EEOC guidance, it simply decided to make explicit in the ADA what the EEOC had clarified in the Title VII context. Notably, *El* did not address the EEOC guidance, which did not relate to religion. *El*, 2011 WL 1769805 at *5-6.

Although *El* was affirmed by the Fourth Circuit, the ruling consisted of an unpublished, four-sentence decision without independent reasoning which itself explicitly referenced the Fourth Circuit's rule that "[u]npublished opinions are not binding precedent in this circuit." *El v. Max Daetwyler Corp.*, 451 F. App'x 257, 258 (4th Cir. 2011). Where multiple circuits have concluded that Title VII bars discrimination based on perceived national origin, a judge in this District has issued a persuasive opinion in *Arsham* reaching the same conclusion, and the EEOC guidance establishing this point can reasonably be reconciled with the language of the statute, the Court is unpersuaded that *El*'s analysis of the related issue of whether perceived religion is a basis for a Title VII discrimination claim requires a different result. The other unpublished district court cases cited by MVM which rely on the same reasoning as *El* are equally unpersuasive. *See Yousif v. Landers McClarty Olathe KS, LLC*, No. 12-2788-CM, 2013 WL 5819703, at *4 (D. Kan. June 5, 2013); *Burrage v. FedEx Freight, Inc.*, No. 4:10CV2755, 2012 WL 1068794, at *5 (N.D. Ohio Mar. 29, 2012); *Lopez-Galvan v. Men's Wearhouse*, No. 3:06cv537, 2008 WL 2705604, at *7 (W.D.N.C. Jul. 10, 2008). The Court thus concludes that Title VII permits claims of discrimination based on perceived national origin.

Finally, MVM offers the separate argument that even if claims of discrimination on the basis of perceived national origin are cognizable, such claims must be dismissed because the Charging Parties' EEOC charges did not assert such claims. This argument fails because "EEOC enforcement actions are not limited to the claims presented by the charging parties. Any

violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaints are actionable." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 331 (1980). Here, the EEOC's investigation ultimately led it to issue LODs that, as MVM acknowledges, included a finding of discrimination based on perceived national origin. Accordingly, the Court will deny the Motion to Dismiss to the extent it seeks dismissal of claims based on perceived national origin.

### C. Adverse Employment Actions

In the Amended Complaint, the EEOC alleges that MVM engaged in national origin discrimination based on "unlawful employment practices," including disparate treatment in the form of "discriminatory terms and conditions of employment." Am. Compl. ¶¶ 56-58. Among the allegedly discriminatory actions taken were denying leave to African employees, forcing them to work on their scheduled days off, assigning them to undesirable posts, subjecting them to heightened scrutiny, fabricating incidents of misconduct or poor performance, suspending them without justification, and terminating them for discriminatory reasons. MVM seeks dismissal of any disparate treatment claims based on allegedly discriminatory actions other than suspension or termination.

To establish a discrimination claim based on disparate treatment in the terms and conditions of employment, a plaintiff must show that the employer took an adverse employment action against the plaintiff. *See, e.g., Gerner v. City of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012). "An adverse employment action is a discriminatory act which 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *James v. Booz-Allen & Hamilton*, 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)). In the discrimination context, "an adverse action is one that constitutes a

significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Swaso v. Onslow County Board of Education*, 698 F. App'x 745, 748 (4th Cir. 2017) (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011)). "An action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action." *Spriggs v. Public Service Com'n of Maryland*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Under this standard, the EEOC's claims in Count IV of discriminatory discharge and constructive discharge plainly assert an adverse employment action. As MVM acknowledges, a claim of disparate treatment in suspending employees without pay also involves an adverse employment action. Mot. Dismiss at 22; *see, e.g., Greer v. Paulson*, 505 F.3d 1306, 1317-18 (D.C. Cir. 2007) (in finding that placement on absent-without-leave and leave-without-pay status could be an adverse employment action for purposes of race discrimination, noting that "a suspension without pay" could be an adverse employment action); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2007) ("[A] suspension without pay . . . would constitute an adverse employment action."). To the extent that MVM asserts that any freestanding claims of disparate treatment in other specific matters such as denying leave to African employees, forcing them to work on their scheduled days off, or assigning them to undesirable posts necessarily fail because those actions do not constitute adverse employment actions for purposes of Title VII, the EEOC has clarified that it is making no such discrete claims. Rather, it asserts that the various discriminatory acts short of suspension and termination that are referenced in the Amended Complaint are offered collectively to establish "a larger scheme of harassment . . . culminating in a mosaic of hostility," or, in other words, a hostile work environment. Opp'n Mot. Dismiss at

25

33, ECF No. 22. The EEOC is correct that these allegations, even if not constituting freestanding discrimination claims, are potentially relevant to its other claims. Because a hostile work environment is an adverse employment action under Title VII, such allegations are relevant as incidents that could potentially add up to establish the hostile work environment claim in Count III. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (stating that a hostile work environment violates Title VII and noting that "[w]orkplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances"). Likewise, these allegations may be relevant as evidence of discriminatory intent in support of the claims of discriminatory suspension, discharge, and constructive discharge. Finally, one or more of these actions may constitute an adverse employment action for purposes of the retaliation claim. A retaliatory adverse action is defined more broadly than a discriminatory adverse employment action as an action which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Thus, although such allegations are not offered as discrete disparate treatment claims, they may be relevant as evidence in support of the hostile work environment, discriminatory suspension or termination, and retaliation claims.

Because hostile work environment, discriminatory termination, and retaliation are separately asserted in Counts III, IV, and V, the Court will dismiss Count II—which asserts a claim of "Disparate Terms and Conditions of Employment Based on National Origin"—except to the extent that it asserts a claim of disparate treatment in the issuance of suspensions without pay. The Court construes Count I as asserting a pattern or practice of national origin discrimination in the form of discriminatory suspensions, terminations, and the establishment of

26

a hostile work environment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (stating that to establish a "pattern or practice" of discrimination, a plaintiff must show that "discrimination was the company's standard operating procedure—the regular rather than the unusual practice").

### D.    Constructive Discharge

MVM next asks the Court to dismiss the claim of discriminatory constructive discharge. Since all of the Charging Parties were actually terminated, the constructive discharge claim relates only to the class of aggrieved individuals. Because the Amended Complaint plausibly alleges that MVM's working conditions were so intolerable that members of the class were forced to resign, the Court will not grant the requested relief.

A claim of discriminatory constructive discharge arises when an employee resigns because the "circumstances of discrimination" were "so intolerable that a reasonable person would resign," such that a court will treat the "resignation as though the employer actually fired" the employee. *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016). Thus, the test is "objective intolerability," not "deliberateness, or a subjective intent to force a resignation." *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (quoting *Green*, 136 S. Ct. at 1779). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Indeed, "[c]onstructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 783 (D. Md. 2010) (internal citation and alterations omitted).

Although the Court is not yet convinced that the EEOC will meet this high bar, the Amended Complaint states a plausible constructive discharge claim. The Amended Complaint alleges that Smith complained that "there were 'too many Africans' on the NIH contract" and declared that he would "reduce their numbers." Am. Compl. ¶¶ 19, 40. It specifically alleges that at least nine Africans, foreign-born blacks, and individuals opposing discrimination against Africans were terminated and asserts that the number of Africans on the NIH contract subsequently "decreased by approximately 29 percent," *id.* ¶ 24, with those fired including some of the most prominent Africans, including union leaders and the highest-ranking African on the contract. As alleged, these terminations were based on unfair, heightened scrutiny of such employees and false accusations of poor performance or misconduct. Where the EEOC has plausibly alleged that there was an intentional scheme to reduce systematically the number of African employees through terminations, the EEOC may be able to establish that MVM communicated—through Smith's words and deeds—that the African employees would inevitably be terminated. Especially where the EEOC has plausibly alleged that African security personnel would reasonably believe that termination would cost them their security clearances and thus their ability to work in their chosen field, such a condition could be deemed so objectively intolerable that African employees were effectively compelled to resign preemptively. *See, e.g., EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (2002) ("When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge."); *Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer

would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."). Thus, the Court will not dismiss the EEOC's claim for constructive discharge.

### E. Retaliation

Finally, MVM seeks dismissal of the EEOC's retaliation claim relating to the termination of Lasberry Nwabuwa, on the grounds that the Amended Complaint fails to allege a causal connection between Nwabuwa's alleged protected activity and his eventual firing.

The elements of a Title VII retaliation claim are that (1) the employee engaged in protected activity, such as opposing discrimination; (2) the employee suffered an adverse employment action; and (3) there was a causal link between the two events. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005). The causation element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Here the EEOC plausibly alleges that Nwabuwa would not have been fired but for the fact that he engaged in protected activity. The Amended Complaint alleges that Nwabuwa complained in February 2014 about the discriminatory treatment of Mambu Massaquoi, who was allegedly terminated in connection with a fabricated allegation of misconduct. Then, in September 2014, MVM revoked Nwabuwa's previously approved leave request. In October 2014, MVM falsely accused Nwabuwa of workplace violations such as failing to show his identification to a guard, entering the campus through an unauthorized entrance, and leaving his post unguarded while he moved his car, then suspended him without pay. In December 2014, Nwabuwa was terminated.

MVM argues that the claim that this termination was retaliatory must be dismissed because the time period between the protected activity and the adverse actions was "too great to establish a causal link through temporal proximity alone." Mot. Dismiss at 33. Temporal proximity cannot by itself establish causation unless the protected activity and the adverse employment action were "very close" in time. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Here, however, the EEOC does not rely on temporal proximity alone. The Amended Complaint alleges that MVM engaged in wide-ranging discrimination against a class of African employees over a period of years, that Smith had specifically stated his belief that there were too many Africans on the NIH contract and that he intended to reduce their numbers, and that several other African employees had been terminated in retaliation for opposing discrimination. When the temporal sequence is combined with this raft of allegations, the EEOC has plausibly stated a claim that Nwabuwa's termination was retaliation for his opposition to discrimination. Accordingly, the Court will not dismiss the EEOC's claim that Nwabuwa was retaliated against for engaging in protected activity.

## CONCLUSION

For the foregoing reasons, MVM's Motion to Dismiss is GRANTED IN PART and DENIED IN PART, and the EEOC's Motion to Stay is GRANTED. A separate order shall issue.

Date: May 14, 2018

THEODORE D. CHUANG
United States District Judge